# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>AJIT BHARGAVA,<br>NISHA BHARGAVA, and<br>RUNJHUN BHARGAVA | Docket No.<br><br>MAGISTRATE'S CASE NO.<br><br>**SA11-149M** |

Complaint for violation of Title 18, United States Code § 371

| NAME OF MAGISTRATE JUDGE<br>MARC L. GOLDMAN | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE<br>Beginning on a date unknown and continuing until in or about April 2010 | PLACE OF OFFENSE<br>Orange County | Address of ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on a date unknown and continuing until in or about April 2010, in Orange County, within the Central District of California, and elsewhere, defendants **AJIT BHARGAVA, NISHA BHARGAVA, and RUNJHUN BHARGAVA**, conspired to possess, obtain, accept or receive immigrant or nonimmigrant visas, permits, or other documents prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing that such visas, permits or other documents were procured by means of any false claim or statement or to have been otherwise procured by fraud or unlawfully obtained, in violation of Title 18, United States Code, Section 371.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

**FILED**

**MAR 2 9 2011**

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>/S/ |
|---|---|
| | SPECIAL AGENT CHRISTOPHER KLINGHOFFER<br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>*MARC L. GOLDMAN*<br><br>MARC L. GOLDMAN | DATE<br><br>March 29, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: SL:ll

A F F I D A V I T

I, Christopher Klinghoffer, being duly sworn, hereby declare
as follows:

I.

## INTRODUCTION

1.    I am a Special Agent ("SA") with the United States
Department of Homeland Security ("DHS"), Immigration and Customs
Enforcement ("ICE") and have been so employed since August 2008.
As part of my basic training, I attended a 26-week law
enforcement training course at the Federal Law Enforcement
Training Center in Glynco, Georgia.  My training consisted of a
13-week Criminal Investigator Training Program, and a 13-week
Immigration and Customs Enforcement Special Agent Training
Program.  I received specialized training in human trafficking,
immigration document fraud, marriage fraud, money laundering,
asset forfeiture, importation of narcotics, and employer
sanctions.  Since February 2009, I have personally conducted
investigations involving importation and possession of narcotics,
immigration violations, employer/worksite violations, and
financial crimes related to money laundering and structuring.  I
have also assisted in other investigations including human
trafficking, forced labor, counterfeit identity documents, and
financial crimes related to money laundering and structuring.  I
am currently assigned to the Fraud Unit at the Office of the

1

Assistant Special Agent-in-Charge in Orange County, California.

2.    This affidavit is made in support of criminal complaints against and arrest warrants for AJIT KUMAR BHARGAVA ("AJIT"), NISHA BHARGAVA ("NISHA"), and RUNJHUN BHARGAVA ("RUNJHUN") for a violation of Title 18, United States Code, Sections 371: Conspiracy to Commit Visa Fraud in violation of Title 18, United States Code, Section 1546(a).  This affidavit is also made in support of an application for search warrants to search for evidence of violations of Title 18, United States Code, Sections 371: Conspiracy to Commit Visa Fraud in violation of Title 18, United States Code, Section 1546(a), at the following locations: (1) MPEagle Consultants Incorporated, 20222 State Road, Suites 20220A and 20222B, Cerritos, California, 90703 ("SUBJECT PREMISES 1"); (2) 4785 Blue Mountain Drive, Yorba Linda, California 92887 ("SUBJECT PREMISES 2"); (3) Safe Deposit Box number W0Z0054 ("SUBJECT DEPOSIT BOX 1"); (4) Safe Deposit Box number W0Z1866 ("SUBJECT DEPOSIT BOX 2"); and (5) 2009 Lexus Sport Utility Vehicle ("SUBJECT VEHICLE").

3.    I make this affidavit based on personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.    Oral and written reports about this and other investigations that I have received from other federal agents and law enforcement agencies;

2

b.    Physical surveillance conducted by federal agents, including me; and

c.    Utility records, toll records, and subscriber information.

4.    Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a SA of ICE or another law enforcement officer who had either direct or hearsay knowledge of the statement, to whom I have spoken, or whose report(s) I have reviewed.

5.    Because this affidavit is being submitted for the limited purpose of supporting an application for criminal complaints, arrest warrants and a search warrant, I have not set forth each and every fact learned during the course of this investigation.  Facts not set forth herein are not being relied upon in reaching my conclusion that the warrants should be issued.

## II.

### BACKGROUND INFORMATION REGARDING MARRIAGE-BASED NONIMMIGRANT VISAS

6.    Based upon my training, experience, and conversations with other law enforcement officers that investigate immigration fraud, I am aware of the following:

a.    The United States requires individuals from most foreign countries to obtain a visa prior to entry into the United States.  Immigrant visas are required for foreign nationals who

3

intend to immigrate to the United States and nonimmigrant visas are required for foreign nationals who intend to enter on a temporary basis (such as for tourism, medical treatment, business, temporary work, or study).

    b.    Foreign nationals entering the United States to reside with a United States citizen spouse (husband or wife), must first obtain a conditional resident immigrant visa ("CR-1").

    c.    Foreign nationals who enter the United States pursuant to nonimmigrant visas and subsequently marry United States citizens, may seek conditional and permanent residency in the United States despite entering the United States on a nonimmigrant visa.  Section 245 of the Immigration and Nationality Act provides that a nonimmigrant may adjust to the status of permanent resident while physically present in the United States.  This relieves the foreign national/beneficiary from the requirement of leaving the United States and re-entering as an immigrant.

    d.    In order to obtain an immigrant visa based on a relationship with a United States citizen spouse, the United States citizen spouse (petitioner) must file a Petition for Alien Relative ("Form I-130") with the United States Citizenship and Immigration Services ("CIS").  The Form I-130 establishes the relationship between the United States citizen spouse and the alien spouse.

4

### III.

### PREMISES TO BE SEARCHED

7.     This affidavit is being submitted in support of an application for the issuance of search warrants for the following locations:

a.     MPEagle Consultants Incorporated, 20222 State Road, Suites 20220A and 20222B, Cerritos, California 90703 ("SUBJECT PREMISES 1").  SUBJECT PREMISES 1 is located on the southwest corner of State Road and Del Amo Boulevard.  SUBJECT PREMISES 1 is located in a two-story commercial structure.  The building is constructed of white-colored walls, has glass doors and windows and has a red-tiled roof.  The building is surrounded by paved parking spaces to the south, east, and north.  On the south side of the building, there are large signs bearing the names "Farmers Insurance," "Auto-Fire-Life-Truck-Commercial," "Tony Sanchez," and "BSA Ron Smith & Associates, Industrial/Commercial Builders," and "Travel, Vacation Connection SEACruises."  The south side of the building has one set of glass entry doors that connect a hallway to the north side set of glass entry doors.  The west side of the building bears the numbers "20220 - 20234" in green numbering.  The west side of the building borders State Road.  SUBJECT PREMISES 1 has two entryways.  Doors marked "20220A" and "20222B" are located at the south side of the main hallway, and are the first two doors to

5

the right if entering from the south side set of glass entryway.
In the main hallway of the building, a business directory lists
"MPEAGLE CONSULTANTS INC" located at "20220A" and "MPEAGLE"
located at "20222B."

      b.   4785 Blue Mountain Drive, Yorba Linda, California
92887 ("SUBJECT PREMISES 2").  SUBJECT PREMISES 2 is a
residential home located at the end of a cul-de-sac on Blue
Mountain Drive.  SUBJECT PREMISES 2 is a two-story building, with
tan-colored stucco, and a red-tiled roof.  The north side of
SUBJECT PREMISES 2 faces Blue Mountain Drive.  There are two
large palm trees on the north side of the property.  The driveway
leading to the north side of SUBJECT PREMISES 2 is concrete
inlayed with red colored brick.  The driveway leads to a two-car
garage connected to SUBJECT PREMISES 2.  The garage doors are
white in color and face north.  The walkway leading up to the
north side of SUBJECT PREMISES 2 is also concrete inlayed with
red colored brick.  The front entrance of SUBJECT PREMISES 2 is
covered by an overhanging portion of the roof supported by two
large white pillars.  The door is a solid oak door with a glass
insert in the center.  The south side of SUBJECT PREMISES 2 faces
a sloping hill.

      c.   Safety Deposit Box number W0Z0054 ("SUBJECT
DEPOSIT BOX 1") is located in Washington Mutual/JP Morgan/Chase
Bank, located at 7964 Beach Boulevard, Buena Park, California.

It is accessed through a safe deposit key and AJIT and NISHA are the only authorized signors for SUBJECT DEPOSIT BOX 1.

     d.    Safety Deposit Box number W0Z1866 ("SUBJECT DEPOSIT BOX 2") is located in Washington Mutual/JP Morgan/Chase Bank, located at 7964 Beach Boulevard, Buena Park, California.  It is accessed through a safe deposit key and RUNJHUN is the only authorized signor for SUBJECT DEPOSIT BOX 2.

     e.    2009 Lexus Sport Utility Vehicle ("SUBJECT VEHICLE"), California license plate number SHHCHUP, registered and leased to MPEagle and AJIT.

IV.

<u>ITEMS TO BE SEIZED</u>

     8.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, United States Code Section 371: Conspiracy to Commit Visa Fraud in violation of Title 18, United States Code, Section 1546(a), will be found at SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT DEPOSIT BOX 1, SUBJECT DEPOSIT BOX 2, and SUBJECT VEHICLE:

          a.    Records and documents reflecting occupancy and control of the premises, such as bills, letters, invoices, correspondence, business cards, memoranda, organizational charts, leases, contracts, deeds, mortgages, mail and delivery

7

service packages.

    b.    Records and documents identifying clients of "Maple Eagle Immigration Services, MPEagle Consultants Inc. (including, without limitation, petitioners and beneficiaries in immigration proceedings) such as Rolodexes, client lists, appointment books, calendars, diaries, telephone logs, contracts, correspondence, checks and other forms of payment, and ledgers.

    c.    Client case files, records, and documents regarding any immigration matters, including information identifying clients, contracts, documents regarding fees charged, records of payment, notes, correspondence, status reports, and travel records.

    d.    Records identifying all employees, agents, accomplices, or other associates of Maple Eagle Immigration Services, MPEagle Consultants Inc. or AJIT's offices, including employee personnel records, records of personal corporations, records of independent contractors, employment and independent contractor agreements, business cards, W-2 forms, 1099 forms, payroll records, commission payment records, loans and advances made to

8

employees and others for service(s).

f.   Records pertaining to business activities or
financial transactions conducted by Maple Eagle
Immigration Services, MPEagle Consultants, Inc. or
AJIT, his offices, or any persons associated
therewith, including bank correspondence, account
statements, travel expenses, deposit receipts,
records of wire transfers, checks, drafts, safety
deposit box records, money orders, check ledgers,
certificates of deposit, checkbooks, general
ledgers, financial statements, cash receipts and
disbursements, tax records, purchase orders,
payment vouchers, advertisements, and flyers.

g.   Cash in excess of $1,000.

h.   With respect to any digital devices containing
evidence falling within the scope of the foregoing
search categories, records, documents, programs,
applications or materials, or evidence of the
absence of same, sufficient to show the actual
user(s) of the digital device during the time
period between April 2007 and March 2011.

9.   As used above in paragraph 8, the terms records,
documents, programs, applications or materials include records,
documents, programs, applications or materials created, modified

9

or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.

   10.  In searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

   a.  The physical search of the premises will be conducted by law enforcement agents who are investigating the crimes described in the affidavit (the "investigating agents"). Upon securing the premises, these investigating agents will, if they can do so without reviewing the contents of the digital data contained on any digital device, seek to determine if the digital device contains data falling within the scope of the items to be

10

seized under this warrant.  If, without reviewing the contents of the digital data contained thereon, the investigating agents can make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized.  In attempting to determine whether any digital device contains data falling within the scope of the items to be seized as described in this warrant, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

      b.   If the investigating agents conclude that they cannot make the determination that a digital device contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the crimes described in the affidavit (the "filter team").  The filter team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing, and segregating digital data (the "computer personnel").  The filter team will be consulted (either on-site or off-site) and will, in its discretion, either search the digital device on-site or seize and transport the device to an

11

appropriate law enforcement laboratory or similar facility to be searched at that location.

      c.   Following a seizure of a digital device pursuant to subparagraphs (a) or (b) above, the filter team will conduct the search of the digital device by using search protocols specifically designed to identify items to be seized under this warrant.

      i.   The filter team may examine all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to determine whether the data falls within the items to be seized as set forth herein.  The filter team may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

      ii.   The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      d.   When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

      e.   If the filter team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the

scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       f.   The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on the digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior Court authorization.  The filter team may disclose to this affiant and any other investigating agent any data contained on the digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

       g.   The filter team will complete its search of the digital device as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

       h.   If the search determines that the digital device does not contain any data falling within the list of the items to

be seized pursuant to this warrant, the government will return
the digital device and delete or destroy all the forensic copies
thereof.

  i. If the search determines that the digital device
does contain data falling within the list of the items to be
seized pursuant to this warrant, the government will either
(i) within the time period authorized by the Court for completing
the search, return to the Court for an order authorizing
retention of the digital device; or (ii) retain only a copy of
the data found to fall within the list of the items to be seized
pursuant to this warrant and return the digital device and delete
or destroy all the forensic copies thereof.

  11. In order to search for data that is capable of being
read or interpreted by a digital device, law enforcement
personnel are authorized to seize the following items, subject to
the procedures set forth above:

  a. Any digital device capable of being used to
commit, further or store evidence of the offense listed above;

  b. Any equipment used to facilitate the transmission,
creation, display, encoding or storage of digital data, including
word processing equipment, modems, docking stations, monitors,
printers, plotters, encryption devices and optical scanners;

  c. Any magnetic, electronic or optical storage device
capable of storing data, such as floppy disks, hard disks, tapes,

14

CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory
buffers, smart cards, PC cards, memory calculators, electronic
dialers, electronic notebooks, cellular telephones and personal
digital assistants;

        d.   Any documentation, operating logs and reference
manuals regarding the operation of the digital device or software
used in the digital device;

        e.   Any applications, utility programs, compilers,
interpreters and other software used to facilitate direct or
indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles and
similar physical items that are necessary to gain access to the
digital device or data stored on the digital device; and

        g.   Any passwords, password files, test keys,
encryption codes or other information necessary to access the
digital device or data stored on the digital device.

        12.   The special procedures relating to digital media found
in this warrant govern only the search of digital media pursuant
to the authority conferred by this warrant and do not apply to
any search of digital media pursuant to any other court order.

V.

**SUMMARY OF PROBABLE CAUSE**

**Overview of Investigation**

        13.   On September 15, 2009, the ICE, Orange County Office of

15

the Assistant Resident Agent-in-Charge initiated a compliance enforcement investigation of twenty-one immigration files ("A-files") referred to ICE by CIS as containing possible marriage/visa fraud applications.

14. On September 17, 2009, I reviewed the 21 A-files and discovered that all 21 foreign national had similar immigration/visa filing patterns. The 21 foreign nationals (19 from India, one from Indonesia, and one from the Phillippines) initially entered the United States as nonimmigrants on nonimmigrant visas such as student (F-1) and tourist (B1/B2) visas. Thereafter, all 21 foreign nationals entered into marriages to low-income or unemployed United States citizens and sought immigrant visas based on these marriages. Further review revealed that the letter communications and documentation sent by all 21 foreign nationals and United States citizen petitioners to CIS used the same format, language, structure, and, in some cases, the same marriage certificates, divorce certificates, United States citizen spouses, and marriage witnesses. I also discovered that all 21 foreign nationals and United States citizen petitioner used one of three mailbox centers in Orange County, California and that AJIT and NISHA had access to these mailboxes.

15. Further investigation revealed that AJIT, NISHA, and RUNJHUN operate an immigration services business known as "Maple

16

Eagle Immigration Services" or "MPEagle Consultants, Incorporated" (hereinafter referred to as "MPEagle").  From September 2009 to December 2011, I interviewed approximately seven petitioners (United States citizens who entered into sham marriages for money), three beneficiaries (foreign nationals that hired MPEagle to obtain lawful immigration status in the United States), and an associate of MPEagle hired to recruit United States citizens to engage in sham marriages to foreign nationals and facilitate sham marriages.  Based on this investigation, I believe that AJIT, NISHA, RUNJHUN, and other known and unknown associates conspired to commit visa fraud in violation of Title 18, United States Code, Section 1546(a).

### Addresses Related to Fraudulent Visa Petitions

16.  After reviewing the 21 A-files, I discovered that all 21 foreign nationals used one of three different mailbox stores in Orange County, California: (1) Buena Park Mail & Parcel, 7439 La Palma Avenue, Buena Park, CA 90620; (2) Postmate U.S.A. II, 8850 Knott Avenue, Buena Park, CA 90620; and (3) Postal Service Plus, 2940 West Lincoln Avenue, Suite D, Anaheim, CA 92801.  I obtained the applications for the authorized mail recipients and interviewed the managers at the three mail box locations.

17.  On September 8, 2009, I spoke with manager Alice Park at Postmate U.S.A. II and learned that all four of the mail boxes were paid for in cash and that a female by the name of "Nisha"

17

picked up the mail for all four boxes.  Ms. Park provided

"Nisha's" phone number, (714) 926-3256.  I subsequently contacted

Cingular Wireless and confirmed that cellular number (714) 926-

3256 is subscribed to NISHA.

14.  On September 8, 2009, I spoke with manager Alka Patel

at the Buena Park Mail & Parcel Service and learned that all

seven mail boxes at this location were paid for in cash and that

Ms. Patel was unsure who picked up the mail.  I reviewed the

applications for the mail boxes and discovered that NISHA and

AJIT were authorized to pick up mail from the mail boxes and that

mail box 271 was opened by AJIT.

18.  On September 8, 2009, I spoke with manager Bhevena

Patel at the Postal Service Plus and learned that the three mail

boxes were paid for in cash and that Ms. Patel was unsure who

picked up the mail.

**Research Re: MPEagle**

19.  In or about September 2009, I conducted queries of DHS

databases and other law enforcement databases related to the

MPEagle and learned that MPEagle is listed as a registered

consultancy service/general office with the State of California

as of June 4, 2008.  "MPEagle Consultants Inc," located at

SUBJECT PREMISES 1, is filed under California business license

number "13429" and has a valid business license until June 30,

2009.  The owner/officer is listed as NISHA.  The business

18

address is listed as SUBJECT PREMISES 1.  However, the mailing
address is listed as "7439 La Palma Avenue BMB 271, Buena Park,
California 90620."  This address is the mail box that AJIT opened
at Buena Park Mail & Parcel Service referenced in paragraph 25.

20.  On March 22, 2011, I conducted queries of the Dun and
Bradstreet database and discovered that MPEagle lists its address
as 20220 State Road, Cerritos, California 90703.  According to
this query, MPEagle's information was reported on January 13,
2011.  MPEagle (doing business as "MPEC Inc.," "Maple Eagle
Immigration Services," and "MPEagleTech.com Incorported") list
AJIT as a registered agent, and RUNJHUN as the president.

21.  On March 22, 2011, I conducted a query in the
Consolidated Lead Evaluation and Reporting ("CLEAR") database and
learned that AJIT and RUNJHUN are listed as registered agents and
officers of MPEagle.  NISHA was also listed as a manager and
principal for MPEagle.  On March 29, 2011, I conducted a query in
the Martindale Hubbell database and confirmed that AJIT, NISHA,
and RUNJHUN are not listed as attorneys in the United States or
Canada.

22.  On or about April 29, 2009, I conducted internet
research on MPEagle and discovered that MPEagle maintains a
website, "www.mpeagle.com."  I reviewed this website and learned
the following:

a.  MPEagle lists its mission as providing integrated

19

immigration services exclusively to employment, business, and investment needs of USA based corporations/individuals and the businesses from all over the world;

      b.   MPEagle's website lists links on the right-side of the web page including nonimmigrant visas, employment immigration, and green card by family;

      c.   MPEagle's website contains a web page link titled "Contact Us." The "Contact Us" page lists four "MPEagle Immigration Services" locations: (1) 20222 State Road, Cerritos, California 90703; (2) 776 Dekalb Industrial Way, Decatur, Georgia, 30033; (3) a New Jersey listing containing only a phone number; and (4) 307, Royal Plaza, New Link Road, Lokhandwala, Andheri, Mumbai, 400 053 India. The India office lists a "Ms. Almas," as the point of contact for "MPEagle Consultants Pvt. Ltd. India."

23. California Employment Development Department ("EDD") records all persons according to their social security numbers upon payment of California state income tax. On June 22, 2010, with the assistance of EDD, I determined that AJIT and RUNJHUN are listed as being employed by MPEagle. NISHA is not registered with EDD as having any employment in the state of California.

## Interviews of United States Citizen Petitioners

**A.   Marci Margaret Danner**

24.   On September 24, 2009, Special Agent ("SA") Mark Speidel and I interviewed Marci Margaret Danner ("Danner") in Long Beach, California.  The interview was in reference to A-File A87-141-790, which contained documents that Danner, a United States citizen, filed and subsequently withdrew a petition for alien spouse (Form I-130) on behalf of Amit Desphande ("Desphande").  Danner provided the following information:

   a.   Danner initially stated that she was not married.

   b.   Danner reviewed the Petition for Alien Relative (Form I-130) containing Danner's information as the petitioner and Desphande's information as the beneficiary and stated that she did not file this petition, that the signature was her signature, and that the photograph of Danner as the petitioner was not a photograph of her.  (I reviewed the photograph and confirmed that the photograph was not of Danner).  Danner stated that she had never seen or heard of Desphande.

   d.   Danner dealt with MPEagle in 2007.  Danner was approached by an unknown female at a bar and was asked if she was interested in "making a few bucks."  Danner was taken to MPEagle located in Los Angeles or Orange County.  Danner explained that MPEagle had since moved to a new location off the 605 Freeway in California.  Danner went on to explain that she was introduced to

an older heavy set Indian male who went by the name "AJ," (subsequently determined to be AJIT), and his wife an older Indian female (subsequently determined to be NISHA).

      e.   AJIT represented himself as a lawyer and that AJIT took all of Danner's biographical information including marriage status.  AJIT agreed to pay Danner $1,000 to marry an Indian national and an additional $1,000 once the Indian national received his United States citizenship for a total of $2,000. AJIT advised Danner to come back on a different day to meet Boyas Devvya ("Devvya") and that if Danner knew any other young women that would be interested in being paid to engage in a fraudulent marriage, to bring them as well.

      f.   During the next meeting with AJIT, Danner met Devvya.  AJIT advised Danner and Devvya that they would be taken to get married and they should expect to be interviewed separately and that they should make sure that they get to know each other in order to match up their stories during the upcoming interviews.  Danner explained that an unknown female drove Danner and Devvya to a courthouse in Norwalk, California to get married and sign miscellaneous paperwork. The unknown female advised Danner and Devvya to bring a couple different sets of clothes. The unknown female drove Danner and Devvya to different locations to take pictures in different clothing.

      g.   Danner was given a check for approximately $700

and was driven to AJIT's bank to cash the check.  Danner and Devvya exchanged numbers and parted ways.

       h.    Danner knew that the marriage she participated in was fraudulent.

       i.    Danner had no further contact from AJIT or MPEagle, but did receive a call from Devvya.  Devvya advised Danner that AJIT was asking for more money and that he felt as though AJIT was "scamming" them and that he had not received any immigration benefits to date.  Danner then visited AJIT at MPEagle to retrieve the remaining payments owed to her.  AJIT advised Danner that Devvya had not received any benefits because he had failed to complete "certain things" and that AJIT did not have any money to pay Danner at that time.  AJIT agreed to pay Danner $200 in cash every week until she was paid in full starting the next week.  Danner claimed that she received that last payment from AJIT at MPEagle in or about June 2008.

       j.    Danner had no idea that her signature and identification were used for a petition for alien spouse on behalf of Desphande.  Danner provided a copy of her marriage license and certificate to Devvya.

    25.  On January 5, 2010, I presented Danner with individual photos of AJIT and NISHA.  Danner identified AJIT's photo by his first name and added that he was the individual that arranged the marriage and was in charge of MPEagle.  Danner also identified

NISHA's photograph as "AJIT's wife," and that she was involved with MPEagle.

26.    On March 10, 2010, I reviewed A-file A87-068-761 related to Devayya and learned the following:

  a.    Devayya is a native and citizen of India;

  b.    Devayya entered the United States on or about September 30, 2000 on a B1/B2 tourist visa;

  c.    On or about November 30, 2007, a Petition for Alien Relative (Form I-130) was filed on behalf of Devayya by Danner;

  d.    A copy of a license and certificate of marriage, number 2007 19023751, was included with the Form I-130.  The marriage certificate indicates that "Boyas Devvya" and Danner married on October 23, 2007 in Norwalk, California.

  e.    On April 16, 2008, Devayya withdrew his request for adjustment of status to lawful permanent residence;

  f.    On November 6, 2008, Danner withdrew her petition for alien relative on behalf of Devayya.

27.    On March 10, 2010, I reviewed A-file A87-141-790 related to Desphande and learned the following:

  a.    Desphande is a native and citizen of India;

  b.    Desphande entered the United States on or about May 24, 2003 as a C1/D crewman visa;

  c.    On or about February 6, 2009, a Petition for Alien

Relative (Form I-130) was filed on behalf of Desphande by Danner;

d.    A copy of a license and certificate of marriage, number 2007 19023751, was included with the Form I-130.  The marriage certificate indicates that Desphande and Danner married on December 23, 2007 in Norwalk, California;

e.    A copy of a Decree of Divorce for Danner and Devayya in the Eighth Judicial District Court of the State of Nevada, in and for Clark County, Case Number D-08-397816-Z, was also included with the Form I-130.  A query of the Clark County Family Court system for case number D-08-397816-Z reveals that this case number is related to a Joint Petition for Summary Decree of Divorce of Rasilaben Ramanialin Patel and Ghanshyam Pashabhal Patel.

28.   On or about March 10, 2010, I compared the marriage certificates for Desphande and Devayya and discovered that the marriage certificate submitted to CIS regarding Deshpande was an altered copy of Danner and Devvya's marriage certificate.  Both certificates contain the same registration number.

**B.    Jennifer Scuteri**

29.   On April 20, 2010, GS Ezequiel Garcia and I conducted an interview of Jennifer Scuteri ("Scuteri") at 34 Civic Center Plaza 4th Floor, Santa Ana, California.  The interview was in reference to A-File A87-275-869, which contained a petition for alien relative (Form I-130) filed by Scuteri on behalf of Abishek

Bhatnagar ("Bhatnagar").  According to the A-file documentation,
Bhatnagar was attempting to enter the United States as a spouse
of a United States citizen (Scuteri).  I previously interviewed
Scuteri on September 30, 2009 and January 4, 2010, and on both
occasions, Scuteri denied that she had been involved in any
fraudulent marriages.  On April 20, 2010, Scuteri provided the
following information:

      a.   Scuteri wanted to finally tell the truth and
advised that she had married Bhatnagar for money.  Scuteri
explained that approximately two to three years ago she was
dating Ryan Richie ("Richie").  During that time, Richie told her
that he was getting paid $2,000 for marrying an Indian national
for three months.  Scuteri added that $1,000 was to be paid at
the time of the marriage and $1,000 after three months, at which
point the marriage would be annulled.  Richie took Scuteri to
MPEagle in Artesia, California.  Scuteri and Richie met with a
lawyer named "AJ," (subsequently identified as AJIT), and AJIT's
wife (subsequently identified as NISHI), and AJIT's daughter
(subsequently identified as RUNJHUN) was present at the office
answering telephone calls.  At that time, AJIT and NISHA took
Richie's information and made copies of his identification.
Richie was also instructed to sign a prenuptial agreement
regarding the Indian national he was to marry named Tulika Singh
("Singh").  Scuteri advised that Singh was Bhatnagar's real wife.

26

NISHA asked Scuteri if she was interested in participating and advised her to not worry because it would only take three months. Scuteri declined at that time and walked out to wait in the car.

b.   Scuteri visited MPEagle a second time with Richie and Brink.   NISHA then took Scuteri's information and made copies of Scuteri's identification.   Scuteri was instructed to sign a prenuptial and paperwork that was already filled out.   Scuteri was then shown a picture of an unknown Indian national that she would be marrying.   Scuteri knew that what she was doing was illegal and that she had questioned NISHA and Richie about the legality of the process.   Richie and NISHA laughed, smirked, and waived it off as if it shouldn't be talked about.

c.   Scuteri was instructed by NISHA and Brink to bring in her tax information for the next meeting and extra clothes for the day of the marriage.   NISHA advised Scuteri that all mail and correspondence regarding the marriage and subsequent paperwork would go to a common address set up by MPEagle.   NISHA added that someone else would pick up the mail.   NISHA also explained that if someone visited that address, a friend who was in charge of that address would direct them elsewhere.

d.   Scuteri visited MPEagle a third time with Richie. Scuteri brought her tax information and was directed to an Indian male upstairs who worked for AJIT.   Scuteri was given additional paperwork that was already filled out and was asked to sign.

27

e.   The next day, Brink took Scuteri to the courthouse in Norwalk, California to get Scuteri's birth certificate.  Brink had numerous files with her at the time and that Brink paid the $12 for the birth certificate.  Scuteri advised that 6-7 other couples of United States citizens and Indian nationals were getting married at the time.  Brink told Scuteri that she was at the Norwalk courthouse facilitating the marriages for AJIT almost every day.

f.   Scuteri went to Brink's house where a party was held to celebrate the completion of the fraudulent marriages. The United States citizen petitioners were paid by Brink at the party.  Brink had cashed a check from AJIT and MPEagle and then Brink gave the cash to Richie who paid the participating United States citizen petitioners.

g.   On December 13, 2007, Scuteri was taken by Brink to meet Singh, Bhatnagar, and Richie at the courthouse in Norwalk, California.  Scuteri explained that Richie and Singh stood in line with her and Bhatnagar to provide the courthouse proof of the divorce between Bhatnagar and Singh and to retrieve the subsequent marriage licenses for Bhatnagar and Scuteri as well as Richie and Singh.  Richie and Singh were then married. Scuteri observed Richie crossed his fingers behind his back while making his vows.  Scuteri and Bhatnagar were then married with Brink signing as witness to the marriage.

28

h.     Scuteri and Bhatnagar were then taken to Wells Fargo Bank to open a joint bank account but were denied.  Scuteri and Bhatnagar as well as Richie and Singh then were taken to "In & Out Burgers" where pictures were taken to make the relationship seem valid.  They were then taken to Starbucks where they were instructed by Brink to change clothes in order to take additional pictures.  Bhatnagar and Singh then returned to New York.

i.     Richie paid Scuteri $1,000 in cash approximately a week later.  After three months passed, Richie called AJIT at MPEagle arguing about the remaining money yet to be paid to Richie and Scuteri.  Richie said he would send his "tax guy" to get the remaining money from AJIT.  A few days later, Richie paid Scuteri $600 in cash, and stated that the other $400 was the percentage paid to his "tax guy" for getting the money from AJIT and MPEagle.

j.     In August 2008, Scuteri was contacted by Bhatnagar regarding getting their marriage being annulled and learning more information about each other to prepare for possible immigration interviews.  Singh and Bhatnagar paid for Scuteri and Richie to come out to New York to take additional pictures, develop a common story explaining the divorce and subsequent marriages.  Bhatnagar and Singh told Richie that they would pay Richie and Scuteri $1,000 each once they arrived in New York.  Scuteri and Richie traveled to New York, but they were not paid.  Extra

29

pictures were taken and stories for how each met were rehearsed.
Richie became upset that he and Scuteri were not paid and they
subsequently returned to California three days later.
Thereafter, Scuteri broke ties with Richie.

    30.  I presented Scuteri with a photographic six-pack line-
up containing a photograph of AJIT.  Scuteri immediately pointed
out and identified AJIT as "AJ."  I then presented Scuteri with a
photographic six-pack line-up containing a photograph of NISHA.
Scuteri immediately pointed out and identified NISHA as "AJ's
wife."  I then presented Scuteri with a photographic six-pack
line-up containing a photograph of RUNJHUN.  Scuteri pointed out
and identified RUNJHUN as "AJ's daughter."  I then presented
Scuteri with a photographic six-pack line-up containing a
photograph of Brink.  Scuteri immediately pointed out and
identified Brink by name.

    31.  On March 10, 2010, I reviewed A-file A87-275-869
related to Bhatnagar and learned the following:

        a.  Bhatnagar is a native and citizen of India;

        b.  Bhatnagar entered the United States on August 26,
2005 on a "F1" student visa;

        c.  On February 3, 2008, a Petition for Alien Relative
(Form I-130) was filed on behalf of Bhatnagar by Scuteri;

        d.  A copy of a license and certificate of marriage,
number 2007 19027859, was included with the Form I-130.  The

marriage certificate indicates that Bhatnagar and Scuteri married
on December 13, 2007 in Norwalk, California and that Bobbie Brink
witnessed the marriage;

      e.   On October 29, 2008, petitioner Scuteri withdrew
the Form I-130 petition;

      f.   On December 16, 2008, CIS denied the Form I-130
petition on behalf of Bhatnagar.

   32.  On March 10, 2010, I reviewed A-file A87-141-258
related to Pruthi and learned the following:

      a.   Pruthi is a native and citizen of India;

      b.   Pruthi entered the United States on July 12, 2002
on a "B1/B2" tourist visa;

      c.   On February 5, 2009, a Petition for Alien Relative
(Form I-130) was filed on behalf of Pruthi by Scuteri;

      d.   A copy of a license and certificate of marriage,
number 2007 19027859, was included with the Form I-130.  The
marriage certificate indicates that Pruthi and Scuteri married on
December 13, 2008 in Norwalk, California and that Bobbie Brink
witnessed the marriage;

      e.   A copy of a Decree of Divorce for Scuteri and
Bhatnagar in the Eighth Judicial District Court of the State of
Nevada, in and for Clark County, Case Number D-08-397816-Z, was
also included with the Form I-130.  A query of the Clark County
Family Court system for case number D-08-397816-Z reveals that

this case number is related to a Joint Petition for Summary Decree of Divorce of Rasilaben Ramanialin Patel and Ghanshyam Pashabhal Patel.

      f.  On June 1, 2009, CIS denied the Form I-130 petition on behalf of Bhatnagar indicating that petitioner and beneficiary failed to attend a scheduled interview.

    33.  On or about March 10, 2010 I compared the marriage certificates submitted to CIS in conjunction with petitions for Pruthi and Bhatnagar and determined the certificate related to Pruthi to be an altered copy of Scuteri and Bhatnagar's marriage certificate.  Both certificates contain the same registration number.

## C.  David Barnett

    34.  On May 24, 2010, SA Victor Ley and I conducted an interview of David Barnett ("Barnett") in Bellflower, California. The interview was in reference to A-File A87-263-558, which contained a petition for alien relative (Form I-130) filed by Barnett on behalf of Angela Crisanto ("Crisanto"). According to A-file A87-263-558, Crisanto was seeking to enter the United States as a spouse of a United States citizen.  During the interview, Barnett provided the following information:

      a.  Approximately two years ago, Barnett was solicited by his friend Brink to participate in a fraudulent marriage. Brink was a "middle-man" for AJIT and his company named "Maple

Eagle" (subsequently identified as MPEagle).  MPEagle, AJIT,
NISHA, and RUNJHUN were known in the Indian community for
engaging in immigration fraud.

b.   Barnett visited MPEagle at its original location
on Pioneer Street in Artesia, California.  Barnett spoke with an
Indian man named AJIT at the office.  AJIT said he would be paid
$2,000 to marry a female so she could gain immigration benefits.
AJIT explained that the fraudulent marriage would only need to
last three months and then could be annulled.  Barnett was
instructed by AJIT to sign some paperwork that was filled out
previously by an unknown person and to obtain a passport
photograph.  Barnett met with AJIT a second time before the
marriage at which time he provided AJIT with his tax information
and signed additional paperwork that was pre-filled.

c.   Barnett met Crisanto at least once before the
marriage.  Barnett explained that this was to ensure that he and
Crisanto would be comfortable around each other during the
fraudulent marriage ceremony.  On November 27, 2007, Barnett and
Crisanto completed the marriage with Brink signing as witness.
Brink then took pictures of Crisanto and Barnett together at the
courthouse and a nearby park.  Barnett and Crisanto then opened a
joint bank account together in order to make the marriage seem
more legitimate.  Barnett was paid $1,000 in cash by Brink.

d.   AJIT explained that he and his office would open a

33

P.O. Box and that all the documentation would be mailed to and from that P.O. Box.  Barnett was instructed by AJIT to take a passport photo but did not remember exactly when, in correlation to the other events, it occurred.

> e.  Approximately three months after the marriage, Barnett visited MPEagle in order to obtain the remaining $1,000 owed to him.  AJIT only paid him $500 in the form of a cashier's check.  Barnett visited MPEagle at least two additional times to obtain the remaining $500 which was paid in cash by AJIT.

> f.  Crisanto contacted Barnett and stated that AJIT had not come through on his promises regarding her immigration. Barnett and Crisanto then attempted to file a second time for her petition for immigrant status, but that no additional money exchanged hands.  Barnett did not know how much Crisanto paid MPEagle.

> g.  AJIT, NISHA, and Brink worked at MPEagle.  Barnett stated that the office moved to 20222 State Road, Cerritos, California.  Barnett was paid $500 cash and a $500 cashier's check by AJIT in his office at the new location.

35.  I presented Barnett with a photographic six-pack line-up containing a picture of AJIT.  Barnett recognized and identified AJIT as "AJ" the owner/operator of MPEagle.  I presented Barnett with a photographic six-pack line-up containing a picture of NISHA.  Barnett recognized and identified NISHA as

34

"AJ's wife," and that she worked for MPEagle.  I presented Barnett with a photographic six-pack line-up containing a picture of Brink.  Barnett recognized and identified Brink by name.  I then presented Barnett with surveillance photographs of SUBJECT PREMISES 1.  Barnett identified the building as the location of MPEagle.  Barnett was then presented with a photograph of SUBJECT PREMISES 1's interior door numbered "20222."  Barnett advised that it was the entry door to the MPEagle office.

36.  On March 10, 2010, I reviewed a copy of A-file A87-263-558 related to Crisanto and learned the following:

a.  Crisanto is a native and citizen of the Philippines;

b.  Crisanto entered the United States on or about June 23, 1999 on a "B1/B2" tourist visa;

c.  On or about January 13, 2008, a Petition for Alien Relative (Form I-130) was filed on behalf of Crisanto by Barnett;

d.  A copy of a license and certificate of marriage, number 2007 19026623, was included with the Form I-130.  The marriage certificate indicates that Crisanto and Barnett married on November 27, 2007 in Norwalk, California and that Brink witnessed the marriage;

e.  On February 5, 2009, the Form I-130 petition on behalf of Crisanto was denied by CIS indicating that petitioner and beneficiary failed to appear for their scheduled interview.

35

## Interviews of Foreign National Beneficiaries

### A.    Varun Pruthi

37.    On March 8, 2010, SA Pete Diaz, GS Ezequiel Garcia, and I conducted an interview of Pruthi at 34 Civic Center Plaza 4th Floor, Santa Ana, California 92701. SA Klinghoffer asked Pruthi to explain his current immigration status in the United States. During the interview, Pruthi provided the following information:

a.    Pruthi stated that he was "in status" under a work visa ("H1B Visa"). Pruthi was unaware of the name of the employer or company that had sponsored him and that his lawyer "Ajit" (subsequently determined to be AJIT) from MPEagle had his visa.

b.    Pruthi stated that AJIT was not a lawyer but ran an immigration service company named MPEagle.

c.    Pruthi was originally admitted into the United States as a B1/B2 visitor in 1998, but overstayed his visa around July 2002. Pruthi found a newspaper advertisement for MPEagle in approximately the first quarter of 2007. Pruthi called MPEagle and spoke with AJIT and made an appointment to meet at SUBJECT PREMISES 1.

d.    At their first meeting, AJIT discussed Pruthi'S options to garner immigration status within the United States, a social security card, an employment authorization card ("EAD"), and a California Driver's License. AJIT said that he would be

able to work with Pruthi as long as Pruthi had entered the United
States legally, and that it did not matter that Pruthi was an
overstay. AJIT explained two options to Pruthi. According to
Pruthi, option one was presented as an H1-B visa sponsorship.
Pruthi stated that AJIT produced approximately ten files showing
Indian nationals that he had successfully garnered H1-B visas
for. AJIT charged $15,000 for option one, and that AJIT required
$5,000 upfront to begin the process. AJIT then offered option
two, which was the facilitation of a marriage to a United States
citizen. AJIT advised Pruthi that he could marry a United States
citizen in order to garner a visa as a spouse of a United States
citizen. AJIT advised Pruthi that he could derive all
aforementioned documents and permanent status by marrying a
United States citizen. AJIT added, that after two years, Pruthi
could discontinue the marriage and keep the previously garnered
benefits. AJIT charged $35,000 to $40,000 for option two.
Pruthi "knew the marriage thing was a fraud," so he opted for a
H1-B visa instead and made a future appointment to meet and pay
AJIT the initial $5,000.

     e.   Pruthi met with AJIT a second time to pay the
$5,000 and to start the process of obtaining the H1-B Visa. An
Indian man named "Amaan" took copies of Pruthi's passports and
birth certificate, and AJIT's daughter (subsequently determined
to be RUNJHUN) took Pruthi to get new photographs for the

application process.   Pruthi then met with AJIT at MPEagle and
paid him $5,000 in cash.

       f.   Pruthi asked AJIT what he needed to do for the H1-
B visa process, but AJIT advised Pruthi that he would take care
of everything.   Pruthi then asked AJIT how it would be done and
AJIT told Pruthi not worry about how it is done since that was
why Pruthi was paying him.   Pruthi added that AJIT only asked for
Pruthi's full name, Pruthi's parents' names, home address, and a
copy of his grades from India.

       g.   AJIT told Pruthi that all the mail associated with
getting the H1-B visa would come to AJIT and not be sent to or
received by Pruthi.   AJIT added that Amaan would call to update
Pruthi on his visa status and that, with a tracking number,
Pruthi could use to track his immigration status on
"www.MPEAGLE.com."

       h.   Pruthi stated that 7-8 months passed without any
contact or update from AJIT or MPEagle.   Pruthi subsequently
called AJIT to determine his immigration status.   AJIT advised
that he had not been able to garner a H1-B Visa for Pruthi
because his business had been slow and that Pruthi could get his
money back.   Pruthi then met with AJIT at MPEagle.   AJIT then
offered to continue working on getting Pruthi his H1-B visa if
Pruthi accepted a temporary reimbursement of $3,000.   Pruthi
accepted and AJIT produced $3,000 cash from his desk and gave it

back to Pruthi; advising Pruthi that once the process was complete that Pruthi would still owe the remaining $13,000.

    i.    A couple months later, Pruthi received a call from Amaan advising Pruthi to get a tuberculosis test ("TB test"), and a validated vaccination history from a doctor.  Pruthi explained that Amaan directed Pruthi to an Indian doctor who worked in Cerritos, California on 180th street.  Pruthi advised that he visited the physician he was directed to and completed the TB test and provided his vaccination record to the doctor.  Pruthi explained that he did not remember the physician name or the name of his practice.

    j.    Amaan called again a couple months later and congratulated Pruthi on receiving a Social security card.  Amaan advised Pruthi to go to the Social Security Office to take his fingerprints, before Pruthi could physically receive his social security card.  Pruthi advised that he followed Amaan's directions and met with Amaan at MPEagle after a couple days.  Amaan advised Pruthi that MPEagle was waiting for the immigration documents and would call Pruthi once they arrived.  Amaan added that Pruthi should have the remaining $13,000 ready to pay AJIT.

    k.    Pruthi stated that a month later he received a call from Amaan advising that the documents had arrived.  Pruthi proceeded to MPEagle and picked up his social security card, EAD, and California Driver's License.  Pruthi advised that he met with

AJIT two days later at MPEagle.  Pruthi paid AJIT the remaining
$13,000 in cash in AJIT's office.  Pruthi asked AJIT how he was
able to get the documents.  AJIT again told Pruthi that Pruthi
should not worry about how it was done.  Pruthi explained that
per AJIT the EAD was supposed to be valid for two years, but,
upon inspecting the EAD, Pruthi found it was only valid for one
year.  Pruthi questioned AJIT why the EAD was only valid for one
year and that AJIT told Pruthi not to worry and that he would
take care of the renewal free of charge.

       l.  Pruthi never received a physical H1-B visa, but
assumed that AJIT and MPEagle had it.  Pruthi was currently
single and has never been married.

       m.  Pruthi never signed any paperwork and never filled
out any immigration documents related to a marriage petition.  (I
presented Pruthi with an I-130 and I-485 that appeared to have
been signed by Pruthi.)  Pruthi claimed that he did not complete
the forms and thought the signature was similar to his, but it
was not signed by him.  Pruthi did not recognize the name
"Jennifer L. Scuteri" and did not recognize a photograph of
Scuteri.

      38.  On March 11, 2010, Pruthi provided me with three
receipts from MPEagle signed by AJIT.  The receipts provided the
following information: (1) Receipt Number: 0631028, Date: October
10, 2008, Received from: Pruthi, Amount: $5000.00, For:

Immigration Consultancy, Received/Signed by: AJIT; (2) Receipt Number: 908601, Date: February 18, 2009, Received from: Pruthi, Amount: $3000.00, For: Immigration Process, Received/Signed by: AJIT; (3) Receipt Number 908602, Date: May 7, 2009, Received from: Pruthi, Amount: $7000.00, For: Immigration Process, Received/Signed by: AJIT. The sum of the receipts totaled $15,000.00.

39.  I asked Pruthi to describe the MPEagle office and Pruthi stated that the door to MPEagle opens to a large, main room. Situated in front of the entrance, is a desk occupied by Amaan. Pruthi added that to the left is a desk that is usually occupied by AJIT'S wife. Pruthi explained that to the left, is a door to AJIT's office. Pruthi stated that AJIT has a desk in the office and that most of the files are stored there.

40.  I presented Pruthi with a six-pack photograph line-up containing a photograph of AJIT. Pruthi recognized and identified AJIT'S photograph as "AJIT." I presented a six-pack photograph line-up containing a photograph of NISHA. Pruthi recognized and identified NISHA as "AJIT's wife." I presented a six-pack photograph line-up containing a photograph of RUNJHUN. Pruthi recognized and identified RUNJHUN as "AJIT's daughter." I presented a photograph of SUBJECT PREMISES 1. Pruthi stated that MPEagle was located within the main hall of the building depicted. I presented a picture of SUBJECT PREMISES 1's door

41

containing a door plaque with "20222." Pruthi recognized the door as the entrance to the MPEagle office. I presented a photograph of a red 2010 Lexus sport utility vehicle bearing license plate number "6JJF353." Pruthi recognized and identified the vehicle as being owned by AJIT.

**B. Angela Crisanto**

41. On May 5, 2010, SA Alejandra D'Angelo and I conducted an interview of Angela Crisanto at 34 Civic Center Plaza 4th Floor, Santa Ana, California 92701. I requested that Crisanto explain how she came to marry Barnett. Crisanto provided the following information:

a. Crisanto explained that approximately two years ago she learned about a company that they could help with acquiring immigrant status. Crisanto advised that the company name was "Maple Eagle" (subsequently identified as MPEagle).

b. Crisanto visited MPEagle at its original location on Pioneer Street in Artesia, California. Crisanto spoke with an Indian man named AJ (subsequently identified as AJIT) at the office. AJIT offered her a quick way for her to receive a "green card." AJIT told her that he could find someone for her to marry and that after a couple of months she could get a divorce but keep her immigrant status.

c. AJIT charged $60,000 for the process, which could be paid in installments, and wanted a down payment of $5,000 to

start the process.    Crisanto advised that she could only afford
to pay AJIT $1,000 at the time, and that he accepted the down
payment of $1,000 cash in his office.    Crisanto was told by AJIT
that someone would contact her to introduce her to the man she
would marry.    AJIT explained that he and his office would open a
P.O. Box and that all the documentation would be mailed to and
from that P.O. Box.    AJIT and MPEagle controlled all the mail and
that she would receive nothing but updates from AJIT via email.
Crisanto stated that AJIT told her to come back to the office
when she received an appointment for an immigration interview so
that someone could coach her on how to answer questions and on
what to say in the interview.

        d.    Crisanto met a female named Brink at the
courthouse in Norwalk, California.    Brink introduced Crisanto to
Barnett at that time.    Crisanto was then instructed to fill out a
marriage license application.    Per Crisanto, the marriage did not
occur that day because Barnett did not bring proof of his divorce
from his first wife.

        e.    On November 27, 2007, Crisanto met a second time
with Brink and Barnett at the courthouse in Norwalk, California.
Crisanto then completed her marriage to Barnett with Brink
signing as witness to the marriage.    Brink then took pictures of
Crisanto and Barnett together at the courthouse and a nearby
park.    Crisanto was then instructed by AJIT to open a joint bank

account with Barnett.

     f.  Crisanto was then advised by Brink to return to MPEagle to fill out documents with AJIT.  At the office, AJIT presented Crisanto with multiple documents that were filled out prior to her arrival by someone else.  AJIT told Crisanto what and where to sign on the document, and that she did not read what she signed.  AJIT told Crisanto that the documentation would be filed and that she would be notified later to acquire her fingerprinting.  Crisanto was then instructed to get her medical screening done with a doctor on Pioneer Boulevard in Artesia, California.  (Review of Crisanto'S A-file revealed that the doctor was located on Pioneer Boulevard, Artesia, California.)

     g.  AJIT pressured her to start paying off the remaining $59,000 after her biometrics were completed.  Crisanto advised that she would pay AJIT whatever she could save up instead of a scheduled set amount.  AJIT told Crisanto that she would need a joint sponsor for her application because Barnett's income was too low.  Crisanto used her sister Carolina Roxas as her joint sponsor.  Thereafter, Crisanto received her EAD.

     h.  In March 2008, Crisanto went to check the status of her immigrant application and found that her case had been terminated due her failure to show up for her immigration interview.  Crisanto confronted AJIT, via phone and in person about not receiving her benefits after she had already paid over

$13,000 to him.   AJIT explained that Crisanto could petition
under the Violence Against Women Act ("VAWA") in order to receive
her benefits.   (Based on my training and experience, I know that
VAWA relates to Petition filed on behalf of a Battered or Abused
Spouse ("Form I-360").)   Crisanto refused and then cut ties with
AJIT.

        i.    AJIT, his wife NISHA, their daughter, and Brink
worked at MPEagle.   Crisanto had seen a man named Amaan at the
office once as well.   Crisanto added that the office moved to
20222 State Road, Cerritos, California (SUBJECT PREMISES 1).
Crisanto paid AJIT in his office at the new office location.

        j.    Crisanto describe the MPEagle office as containing
multiple file cabinets throughout the office.   Crisanto added
that there are multiple camera feeds into the office and that the
front door has a hidden camera placed inside so that AJIT and
others in the office knew who was at the door.   AJIT and the
others did not work at the office unless a specific appointment
was made to meet with someone, and that they would arrive at the
office near the time of the set appointment.

    42.   I presented Crisanto with a photographic six-pack line-
up containing a picture of AJIT.   Crisanto recognized and
identified AJIT as "AJIT," the owner/operator of MPEagle.   I
presented Crisanto with a photographic six-pack line-up
containing a picture of NISHA.   Crisanto recognized and

identified NISHA and stated that she worked for MPEagle and that she knew of and helped facilitate the fraudulent marriages.  I presented Crisanto with a photographic six-pack line-up containing a picture of Brink.  Crisanto recognized and identified Brink by name, and that she worked for MPEagle facilitating the marriages.  I then presented Crisanto with surveillance photographs of a building located at 20222 State Road, Cerritos, California.  Crisanto identified the building as the location of the MPEagle office.  Crisanto was then presented with a photograph of SUBJECT PREMISES 1's door numbered "20222."  Crisanto advised that it was the entry door to SUBJECT PREMISES 1 and added that there is a camera hidden on the door that feeds to a monitor within the office.

43.  Crisanto presented me with receipts from and checks to MPEagle and AJIT documenting a total payment of $12,800.  Crisanto also provided an email from AJIT listing AJIT as contact for MPEagle and the director of "Southern California Career College."  The email also noted that "Jyoti Yadav" was a contact for MPEagle at 307 Royal Plaza, New Link Road, Lohhandwala, Andheri (W), Mumbai - 700 053 India.

C.  Anju Tanwar

44.  On October 6, 2010, SA Pete Diaz and I conducted an interview of Anju Tanwar ("Tanwar") in Los Angeles, California.  I asked Tanwar to recount her dealings with MPEagle.  During the

46

interview, Tanwar provided the following information:

    a.    Tanwar and her husband Sanjeev Tanwar ("Sanjeev")
first heard of MPEagle while in India in February 2007.  Sanjeev
called and spoke with AJIT from MPEagle looking to immigrate to
the United States.  AJIT said that he could file for an H1-B visa
for Tanwar and Sanjeev if they paid $20,000.  AJIT explained that
Tanwar and Sanjeev would need to make a down payment of $5,000
into his Indian bank account in the Indian Currency of Rupees,
and that the remaining $15,000 would need to be deposited into
his account in Indian Rupees before he would begin the process.

    b.    Tanwar knew it was likely a scam, but that Sanjeev
was determined to continue.  Tanwar and Sanjeev continued to make
deposits and paid the total $20,000 to AJIT.

    c.    After some time, AJIT told her and Sanjeev that
there were no more H1-B visas left to issue.  Tanwar requested
that AJIT refund the $20,000, but AJIT said that he could not
refund the money.  AJIT then suggested that Tanwar and Sanjeev
apply for a "Snitch Visa,", later determined to be a law
enforcement visa for witnesses/informants ("S-Visa").  Tanwar
told AJIT that she and Sanjeev were both doctors and had no
information about any crime to report to law enforcement.  AJIT
told Tanwar that she and Sanjeev would just need to sit down with
an attorney he knew to rehearse a story that Tanwar and Sanjeev
could testify to in court.  AJIT advised that it would cost

47

$60,000 for the S-Visa, and that Tanwar and Sanjeev could pay for half upfront and the remaining half after they received the S-Visa.

        d.    Soon after, AJIT flew to Mumbai, India and met Tanwar and Sanjeev at a hotel.  Tanwar and Sanjeev then paid AJIT $20,000 in cash in one of the hotel rooms.  Tanwar paid AJIT a total of $40,000 for the S-Visa to date.  Tanwar knew that doing so was completely illegal but that Sanjeev continued to work with AJIT.

        e.    After a short time, Tanwar was contacted by NISHA. NISHA congratulated Tanwar on receiving her H1-B visa.  Tanwar requested that AJIT refund the $20,000 she and Sanjeev paid for the S-Visa.  AJIT told her that her H1-B visa only allowed her to work and that if they wanted legal permanent residence and the ability for Sanjeev to work, that they should continue to try to get the S-Visa.

        f.    On October 13, 2007, Tanwar and Sanjeev entered the United States on the "H1-B visa."  AJIT and NISHA met Tanwar and Sanjeev at the airport and transported them to a home that they could rent for $2,500 per month.

        g.    Tanwar told AJIT that she would need to start working in order to pay the monthly rent, but AJIT said that since the economy was bad that she couldn't get the job at Infotek Career College that he had originally set.  AJIT told

Tanwar to find a job somewhere else, but Tanwar argued that her H1-B was for Infotek with a contract of $4,200 per month.

h.    Tanwar was able to speak with Ashok Garg ("Garg") who was in charge of Infotek.  Garg told Tanwar that he had an agreement with AJIT to sponsor foreign nationals for an H1-B visa, but that he would not hire them.  Tanwar explained that AJIT and Garg had an agreement to split the money paid for the visas.   Tanwar said that Garg agreed to hire her under the table for $1,600 per month.

i.    Tanwar fell into debt due to her low pay and high rent.  Tanwar told Garg that she needed three paychecks in order to prove her employment at Infotek and to transfer her H1B to a new job.  Garg refused to give Tanwar any legitimate paychecks, so Tanwar reported Garg and Infotek to the Department of Labor ("DOL").  Tanwar advised that, right before the mitigation for the claim, Garg provided the three paychecks.  Tanwar then transferred her H1-B to another employer.

j.    Tanwar then requested that AJIT refund the $40,000 paid for the S-Visa because AJIT failed to procure it.  AJIT told Tanwar that he couldn't because the attorney had passed away and he would need to contact his partner first.  Tanwar contacted the partner and requested the refund of $40,000, but was told that the firm has only been paid $15,000 for her case and had fulfilled their obligation.

k.   Tanwar went back to AJIT to try to get a refund on services not provided, but that AJIT refused to pay her back. While at the office of MPEagle, Tanwar saw three male Indian nationals arrive.  According to Tanwar, the three males Indian nationals were there to have MPEagle facilitate fraudulent marriages to United States citizens.  Tanwar added that a blonde female named "Bobbie" (subsequently identified as Brink) worked for AJIT recruiting United States citizens to marry foreign nationals.  Brink would find girls with drinking or drug problems to participate mostly.

l.   In December 2007, Sanjeev called AJIT wanting to get an H1-B visa.  AJIT said that Sanjeev should try to get an EAD and social security card.  When Tanwar asked AJIT how that would be possible, AJIT said that he had a way and that "rules are meant to be broken."  AJIT explained that Sanjeev would first need to get a divorce from Tanwar.  AJIT added that he had contacts in India that could get the divorce paperwork.  After the divorce, AJIT would facilitate a fraudulent marriage between Sanjeev and a United States citizen.  According to AJIT, Sanjeev would only be married for approximately six months; at which point AJIT would have a doctor testify to the mental instability of the United States citizen spouse, due to drugs or alcohol, in order for Sanjeev to get a divorce and still keep his immigration benefits.  AJIT charged $50,000 for the marriage fraud.  Tanwar

told AJIT that she and Sanjeev did not have $50,000 to pay. AJIT then offered to accept a payment plan for the marriage fraud, and that he would first procure the divorce paperwork before they needed to pay him anything.

m.   In March 2008, Tanwar and Sanjeev received the divorce paperwork from AJIT, but did not continue with the fraudulent marriage.

n.   Tanwar explained that Sanjeev traveled to Russia sometime after March 2009 to complete a nursing program. Tanwar cut ties with Sanjeev during this time because of his physical and metal abuse and drive to continue with the immigration scams. According to Tanwar, Sanjeev moved back to India after completing the nursing program in Russia. In February 2010, Sanjeev called AJIT asking for an H1-B visa. AJIT then called Tanwar trying to get help in getting Sanjeev back into the United States. AJIT added that he might be able to get Tanwar a refund for the S-Visa. Tanwar asked AJIT for documentation certifying the she would be refunded.

o.   AJIT ran MPEagle and had offices in Cerritos, California; Atlanta, Georgia; New Jersey; and Mumbai India. NISHA, AJIT'S wife, helped AJIT with MPEagle. "Bulu Bhargava" (subsequently determined to be RUNJHUN), was AJIT'S daughter and that she worked at MPEagle answering phones and monitoring the camera feeds into the office.

45.   I presented Tanwar with a six-pack photographic lineup
depicting AJIT.   Tanwar immediately identified AJIT.   I presented
Tanwar with a six-pack photographic lineup depicting NISHA.
Tanwar immediately identified NISHA.   I presented Tanwar with a
six-pack photographic lineup depicting RUNJHUN.   Tanwar
immediately identified RUNJHUN as "Bulu Bhargava."   I presented
Tanwar with a six-pack photographic lineup depicting Brink.
Tanwar immediately identified Brink as "Bobbie."

46.   On October 6, 2010, I reviewed CIS immigration records
(WAC-0714853177 and WAC-0822150930) related to Tanwar and learned
the following:

   a.   Tanwar is a native and citizen of India;

   b.   On April 2, 2007, Infotech Institute and Ashok
Garg filed a petition for a nonimmigrant worker (Form I-129) on
behalf of Tanwar.

   c.   On May 16, 2007, the Form I-129 petition was
approved by CIS.

   d.   Tanwar entered the United States on October 13,
2007 on an "H1-B" employment-based visa;

   e.   On June 23, 2008, Ashok Garg submitted a letter to
CIS indicating that Infotech terminated Tanwar's employment  and
requested that Tanwar's H1-B status be terminated.

   f.   On August 11, 2008, Singh Neurology Medical Group
filed a Form I-129 petition on behalf of Tanwar requesting a

52

change in her employer.  CIS approved this petition on or about
October 28, 2008.

### Interview of Bobbie Brink

47. On May 26, 2010, GS Ezequiel Garcia and I conducted an
interview of Bobbie Brink at 34 Civic Center Plaza 4th Floor,
Santa Ana, California 92701.  Brink advised that she had wanted
to speak to authorities regarding "AJ," (subsequently determined
to be AJIT), and "Maple Eagle" (subsequently determined to be
MPEagle).  During this interview, Brink provided the following
information:

a.    Approximately four years ago, around November
2006, AJIT approached her regarding work for his company MPEagle
located near Pioneer Boulevard and the 91 Freeway.  AJIT explained
that Brink would find United States citizens, male and female, in
order to marry non-immigrants with student visas.  AJIT explained
that they would be married in order to garner immigrant status
and work permits within the United States.  AJIT added that they
would only need to be married for a period of four to six months
and that after that the marriage could be annulled.  Brink asked
AJIT if what she would be doing was illegal but that AJIT told
her it was completely legal.

b.    The fraudulent marriage scheme was the same for
each case.  AJIT would find a foreign national looking to gain
immigration benefits and offer to facilitate a fraudulent

53

marriage in order to garner the needed benefits for the foreign
national.  AJIT charged $50,000 for the facilitation of the sham
marriage and required a $30,000 down payment before starting
anything.

        c.    AJIT would then tell Brink to find a United States
citizen that met the age and gender parameters.  AJIT also
required that the United States citizen be unmarried/divorced,
have a California driver's license, a valid social security card,
birth certificate, and preferred that the United States citizen
was without children.  AJIT advised that he would pay Brink
$2,500 for every United States citizen she could successfully
recruit and would pay $2,000 to every United States citizen
participating in a marriage.

        d.    Brink solicited potential United States citizen
petitioners by word of mouth.  Most were homeless, on drugs, or
in desperate need of money.  Brink would instruct and/or
accompany the United States citizen to MPEagle.  Upon arrival,
Brink would introduce the United States citizen to AJIT.  AJIT
would have his wife, NISHA, or his daughter, RUNJHUN, make copies
of the United Stated citizen's identification documents.  AJIT
would advise the United States citizen petitioner that he/she
would be paid $2,000 for the marriage and that the marriage would
only need to last 4-6 months, at the end of which, the marriage
could be annulled.  AJIT would have paperwork for the United

States citizen petitioner to sign at the office.  The documents were pre-filled out and that the United States citizen petitioner was instructed to just sign.  AJIT would then instruct the United States citizen petitioner to meet at the Hall of Records in Norwalk, California for the marriage with a change of clothes.

        e.    Brink would accompany or meet the United States citizen and the foreign national at the Hall of Records in Norwalk, California.  This would be the first time that the United States citizen and non-immigrant would meet.  AJIT met her there the first couple times to ensure that the process was being completed correctly.  The United States citizen and foreign national would then apply for a marriage license, which was paid for by the foreign national. Afterwards, the United States citizen and the foreign national would complete the marriage in front of the Justice of the Peace with Brink usually signing as witness to the marriage.  When the Justice of the Peace was too busy, they would complete the marriage at a Pentecostal Church located at 10248 Alondra Blvd, Bellflower, CA 90706.

        f.    After the marriage, Brink would then take the United States citizen and foreign national to get passport pictures taken, and then to a Wells Fargo Bank located on Pioneer Boulevard across the street from the original location of MPEagle.  There, the United States citizen and foreign national would open a joint bank account and deposit $100 into it in order

55

to make the marriage seem legitimate.  AJIT would be present at
times to ensure that the account could be opened.

       g.   Brink would then take the foreign national to a
clinic located at the intersection of Pioneer Boulevard and 183rd
Street in order for the foreign national to complete his/her
medical screening.  Brink explained that the foreign national
never paid the clinic for the screening and that Brink would only
tell the clinic that "this [the screening] was for AJ" and that
the clinic would know what to do.

       h.   After the screening, Brink would take the United
States citizen and foreign national to the library at located at
183rd Street and Bloomfield.  There, Brink would take 8-10
pictures of the United States citizen and foreign national
together; having them change clothes part way through.  This was
done to give the appearance of an ongoing relationship between
the United States citizen and foreign national.

       i.   Brink would then take the United States citizen
and foreign national back to MPEagle where the United States
citizen and the foreign national would go upstairs to talk to an
"unknown lawyer."  There, the United States citizen and the
foreign national would sign more paperwork that was pre-filled
out.  Brink was not sure if the unknown lawyer was really a
lawyer at all.  NISHA then would advise the United States citizen
and foreign national that all mailing would be controlled by

them.  NISHA would explain that she would set up a P.O. Box in the name of the United States citizen, or have an "unknown friend" receive the mail at an "unknown address."  NISHA would at times explain that the United States citizen and foreign national would need to fill out a leasing agreement for an apartment. Brink did not know if the lease was for an actual apartment or not.

j.  After all was completed, AJIT would write a check for a total that would include the payments owed to Brink and any United States citizens participating that day.  The checks were written to Brink's friend due to the fact that she did not have a bank account.  After her friend cashed the check, he would give the money to Brink who would then pay the United States citizens. AJIT would often short the amount paid to her and/or the United States citizens.  AJIT initially stated that the United States citizen would be paid $2,000, but he would then recant after the marriage and then explain to the United States citizen that they would only get paid $1,000 for the marriage and would get the remaining $1,000 after the interview.  The United States citizen and foreign national would then part ways.

k.  United States citizen petitioners would have to contact AJIT multiple times in order to get paid the full amount and that many did not get paid the agreed upon $2,000.  On more than one occasion, AJIT would only end up giving the United

57

States citizen $200 and say he would make partial payments.
According to Brink, AJIT would refuse to meet again with the
United States citizen and did not give them any more money.  AJIT
and MPEagle would not actually garner any of the immigration
benefits for the foreign nationals because he would never notify
the foreign national that an immigration interview was scheduled,
but that he would continue to collect money from the foreign
nationals.  Brink stated that AJIT would stress that the United
States citizen and foreign national not exchange contact
information.  Brink advised that this was done so that the United
States citizen and foreign national could not communicate and
share information.

      l.   Brink stated that a few United States citizens had
threatened to report AJIT to the proper authorities, but that
AJIT told them to "go ahead and talk to the cops; who are they
going to believe, a drug addict or me [AJIT]]?"  AJIT had cameras
installed on the office building.  Brink believes that AJIT
controls the entire bottom eastern half of the building.

      m.   Brink helped facilitate approximately twenty-two
fraudulent marriages for AJIT and MPEagle, but that she was only
paid approximately a total of $20,000.  Brink then stated that
she had brought a case against AJIT and MPEagle with the U.S.
Department of Labor ("DOL").  Information regarding the number of
marriages facilitated by Brink and the money owed to Brink by

AJIT was contained in that proceeding.  Brink added that AJIT had settled to pay Brink $1,000.

n.   AJIT was in control of MPEagle.  NISHA and RUNJHUN work with AJIT in facilitating the marriages and running MPEagle. Brink added that RUNJHUN had been at a few marriages and had taken over for Brink when Brink cut ties with MPEagle.  AJIT, NISHA, and RUNJHUN were all aware that what they were doing was illegal.  Brink believes that AJIT has multiple office locations. Brink believes that there were additional offices in New York and India.  AJIT had requested that she travel to India with a United States citizen to facilitate the United States citizen's marriage to an Indian national.

48.   I presented Brink with a photographic six-pack line up containing a picture of AJIT.  Brink immediately recognized and identified AJIT as "AJ" and the owner/operator of MPEagle.  I presented Brink with a photographic six-pack line up containing a picture of NISHA.  Brink immediately recognized and identified NISHA, that she worked for MPEagle, and that she knew of and helped facilitate the fraudulent marriages.  I presented Brink with a photographic six-pack line up containing a picture of RUNJHUN.  Brink recognized and identified RUNJHUN as "AJ'S daughter," and that she worked for MPEagle and helped facilitate the sham marriages.  I then presented Brink with surveillance photographs of a building located at 20222 State Road, Cerritos,

59

California.   Brink identified the building as the location of the MPEagle office.   Brink added that SUBJECT PREMISES 1 has cameras that feed into a monitor in AJIT'S office.   I then presented Brink with a photograph of SUBJECT PREMISES 1's door numbered "20222."  Brink advised that it was the entry door to SUBJECT PREMISES 1.

### March 17, 2010 Recorded Meeting Between CI1 and AJIT

49.   On March 17, 2010, at approximately 3:52 p.m., a confidential informant ("CI1") met with AJIT at SUBJECT PREMISES 1 and inquired about a renewal of CI1's EAD card.   The conversation was conducted primarily in the Hindi language.   The meeting was audio and video recorded using ICE digital electronic surveillance equipment.

50.   On March 17, 2010, at approximately 4:35 p.m., I spoke with CI1 regarding his/her meeting with AJIT.   Based on my review of the audio recording English transcripts and my discussions with CI1, I learned the following:

    a.   CI1 requested a renewal of his/her EAD card;

    b.   AJIT told CI1 not to worry that the government is slow about updating information;

    c.   CI1 asked if he/she could travel and if AJIT had a stamp for CI1's passport;

    d.   AJIT told CI1 to complete an application for travel document.  AJIT asked CI1 why he was asking so many

questions and why he was worried;

       e.  CI1 asked for a copy of his paperwork and AJIT did not provide CI1 with any paperwork.  AJIT stated that he would call CI1 later in the evening to discuss his/her status;

       f.  CI1 observed AJIT, NISHA, RUNJHUN, and Amaan Shroff at SUBJECT PREMISES 1.

    51.  On March 17, 2010, I reviewed the video recording of the meeting between CI1 and AJIT at SUBJECT PREMISES 1.  SUBJECT PREMISES 1 contains approximately four computers, three computers are visible in the main office space and one computer is visible in AJIT's personal office.

**April 7, 2010 Recorded Call Between CI1 and AJIT**

    52.  On April 7, 2010, CI1 made a recorded call to (562) 246-0300 (MPEagle).  SA Eric Hermelin and I were present in the room during the recorded call.  The conversation between CI1 and AJIT was conducted in a combination of Hindi and English.  After the call, I debrief CI1 and learned the following:

       a.  AJIT answered the phone;

       b.  CI1 asked about his/her EAD card renewal;

       c.  AJIT stated that it was being worked on and that he was attempting to get CI1 a permanent EAD card and that Amaan would call CI1 with an update.

**SUBJECT PREMISES 2**

53. On March 23, 2011, I conducted a query in the CLEAR database. The query revealed that RUNJHUN is the owner of SUBJECT PREMISES 2 and that the deed was transferred to RUNJHUN on April 20, 2010. I also conducted a query of the VeroValue Valuation Report for SUBJECT PREMISES 2 and discovered that RUNJHUN is listed as the property owner of SUBJECT PREMISES 2 and that the home has a mortgage for $948,750.00 on a sale price of $1,265,000.00.

54. In March 2010, I conducted a query in the CLEAR database. The query revealed that from January 2001 to November 2010, AJIT, NISHA, and RUNJHUN rented 18521 Kamstra Avenue, Cerritos, California.

**Surveillance of SUBJECT PREMISES 1 and SUBJECT PREMISES 2**

55. On June 15, 2010, at approximately 6:45 a.m., SA Klingoffer, SA Ley, SA Gleason, SA Hermelin and I conducted surveillance at 18521 Kamstra Avenue, Cerritos, California 90703 and observed a 2009 Lexus Sport Utility Vehicle, California license plate number SHHCHUP, registered and leased to MPEagle and AJIT, and a 2004 Lexus sedan, California license plate 5NGK275, registered to AJIT, parked in the driveway. At approximately 9:16 a.m., I observed AJIT exit the residence with a black rolling briefcase. AJIT proceeded to the rear of the Lexus Sports Utility Vehicle and looked north and south on

62

Kamstra Avenue multiple times before placing the briefcase in the rear cargo area.  AJIT then closed the rear door and proceeded back into the residence and reemerged with a medium to large size brown paper bag and placed it in the vehicle.  AJIT then left the residence and proceeded to drive in a counter surveillance style until reaching SUBJECT PREMISES 1.  At approximately 9:33 a.m., AJIT exited the vehicle with a large day planner and entered SUBJECT PREMISES 1.  At approximately 10:35 a.m., a Lexus sedan driven by RUNJHUN entered the parking area of SUBJECT PREMISES 1.  RUNJHUN exited the vehicle and entered SUBJECT PREMISES 1.  At approximately 10:52 a.m., AJIT exited SUBJECT PREMISES 1 and proceeded to the rear of the Toyota SUV.  AJIT looked around and over his shoulders multiple times before removing the black rolling briefcase and the medium to large brown paper bag.  AJIT took both the briefcase and the bag into SUBJECT PREMISES 1.

56.  On August 23, 2010, I conducted a drive by of 18521 Kamstra Avenue, Cerritos, California 90703 and observed a "For Rent" sign posted on the front gate of the residence and two trash cans on the curb.

57.  On August 24, 2010, ICE SA Peter Diaz and I conducted a trash run at address 18521 Kamstra Avenue, Cerritos, California 90703.  The following items among others were discovered:

a.   Four "India in New York" publications and related advertisement bills for MPEagle;

> b.   "India Current" publication containing advertisement for MPEagle dated June 10, 2010;

> c.   "Little India" publication containing advertisement for MPEagle dated December 2008;

> d.   hand drawn diagram of an office setup;

> e.   handwritten draft of advertisement for MPEagle.

58.   On August 24, 2010, at approximately 6:00 a.m., ICE SA Peter Diaz and I conducted surveillance at SUBJECT PREMISES 2 and observed the following vehicles: (1) 2009 Lexus Sport Utility Vehicle, California license plate number SHHCHUP, registered and leased to MPEagle and AJIT; and (2) 2010 Lexus Sport Utility Vehicle, California license plate number 6JJF353, leased and registered to MPEagle and RUNJHUN; and (3) 2004 Lexus Sedan, California license plate number 5HGM923, registered to NISHA.

59.   On January 11, 2011, at approximately 7:00 a.m., ICE agents conducted surveillance at SUBJECT PREMISES 2.  The following vehicles were observed in the driveway of the location: (1) 2009 Lexus Sport Utility Vehicle, California license plate number SHHCHUP, registered and leased to MPEagle and AJIT; and (2) 2010 Lexus Sport Utility Vehicle, California license plate number 6JJF353, leased and registered to MPEagle and RUNJHUN; (3) 2004 Lexus Sedan, California license plate number 5HGM923, registered to NISHA; and (4) 2007 Toyota sedan, California license plate number 5XDK676 registered to AJIT and "Amaan

Shroff."

60.   On January 11, 2011, at approximately 8:45 a.m., SA Peter Diaz observed AJIT and J. Bhargava exit SUBJECT PREMISES 2 and enter the 2009 Toyota Sport Utility Vehicle.   AJIT was observed placing a back briefcase, two small cases, and two plastic bags into the rear seat of the vehicle.   At approximately 9:15 a.m., the vehicle arrived at a college located in Norwalk, California and J. Bhargava exited the vehicle.   At approximately 9:25 a.m., the vehicle arrived at MPEagle.   AJIT removed the black briefcase from the vehicle and entered SUBJECT PREMISES 1.

61.   On February 10, 2010, at approximately 1:00 p.m., I conducted surveillance of SUBJECT PREMISES 1.   In the parking area outside of the building, I found the following vehicles: (1) 1995 Toyota Sedan, California license plate number 5NGK275, registered to AJIT; (2) 2009 Lexus Sport Utility Vehicle, California license plate number SHHCHUP, registered and leased to MPEagle and AJIT; and (3) 2010 Lexus Sport Utility Vehicle, California license plate number 6JJF353, leased and registered to MPEagle and RUNJHUN.

62.   On March 22, 2011, I conducted surveillance of the building located at 20220 State Road, Cerritos, California 90703. In the main hallway of the building, I observed a business directory listing "MPEAGLE CONSULTANTS INC" located at "20220A" and "MPEAGLE" located at "20222B."

65

**Subject Deposit Box 1**

63.  In March 2010, I received information from Washington
Mutual/JP Morgan/Chase Bank pertaining to SUBJECT DEPOSIT BOX 1.
AJIT and NISHA rented SUBJECT DEPOSIT BOX 1 on January 31, 2007.
SUBJECT DEPOSIT BOX 1 is an active safe deposit box in branch
number 741281 located in Buena Park, California.

**Subject Deposit Box 2**

64.  In March 2010, I received information from Washington
Mutual/JP Morgan/Chase Bank pertaining to SUBJECT DEPOSIT BOX 2.
RUNJHUN rented SUBJECT DEPOSIT BOX 2 on March 3, 2008.  SUBJECT
DEPOSIT BOX 2 is an active safe deposit box in branch number
741281 located in Buena Park, California.

### VI.

### PROBABLE CAUSE TO BELIEVE SUBJECT PREMISES IS PERMEATED WITH FRAUD

65.  I submit that there is probable cause to believe that
the SUBJECT PREMISES 1 is permeated by fraud because Special
Agent Klinghoffer has interviewed numerous "petitioners,"
"beneficiaries," and a co-conspirator/recruiter who have all
engaged in immigration/visa fraud through AJIT and MPEagle.  AJIT
operates MPEagle, an "immigration consulting business" that
assists foreign nationals in fraudulently obtaining nonimmigrant
visas primarily through sham marriages to United States citizens.
As far as I am aware, none of the petitioners interviewed by law

66

enforcement have stated that they entered into a bonafide marriage with a beneficiary of a petition for alien relative, and non of the beneficiaries interviewed by law enforcement have stated that they received a nonimmigrant visa based on a bonafide marriage or bonafide employment relationship with an employer petitioner.  Indeed, based on the witness statements described above, it appears that AJIT, NISHA, and RUNJHUN used MPEagle and SUBJECT PREMISES 1 solely to facilitate their numerous fraudulent visa petitions and does no legitimate work at SUBJECT PREMISES 1.

### VII.

### PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS

66.  The following procedures will be followed in order to avoid unnecessary disclosures of any potentially privileged attorney-client communications:

a.  Prior to the search:  (i) one or more of the law enforcement agents will be designated as members of a "taint" team; (ii) one or more Assistant United States Attorneys ("AUSAs") will be designated as "taint" AUSAs.

b.  Prior to reading any document in its entirety, the searching agents will conduct a limited review of the document in order to determine whether or not the document appears to contain or refer to communications between a current or former client and an attorney ("potentially privileged communications").  If a searching agent determines that a document appears to contain

potentially privileged communications, the agent will not review
the document further and will notify a member of the taint team
to review the document to determine if it appears to contain
potentially privileged communications.

      c.   If a member of the taint team determines that a
document appears to contain potentially privileged
communications, the member will then review only as much of the
document as is necessary to determine whether or not the document
is within the scope of the warrant.  If the document contains
potentially privileged communications, but is not within the
scope of the warrant, the document will be set aside and will not
be subject to further review (by anyone) or seizure.  If the
document contains potentially privileged communications and is
within the scope of the warrant, the taint team member will seize
the document, seal it in an envelope, and mark the envelope as
potentially attorney-client privileged.  The document will then
be delivered to the United States Attorney's Office without any
further review.  No agents involved in the investigation will
open or examine the contents of any such envelopes unless and
until directed to do so by the USAO or the Court.

      d.   The members of the taint team and the taint AUSA
will be instructed that they may not discuss the contents of any
privileged communications with any agents or AUSAs who are
involved in the investigation, absent a Court order.

e.    The taint AUSA will be available for telephonic
consultation with the members of the taint team during the
search.

### VIII.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES

67.    As used below, the term "digital device" includes any
electronic system or device capable of storing and/or processing
data in digital form, including: central processing units; laptop
or notebook computers; personal digital assistants; wireless
communication devices such as telephone paging devices, beepers,
and mobile telephones; peripheral input/output devices such as
keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices such
as modems, cables, and connections; storage media such as hard
disk drives, floppy disks, compact disks, magnetic tapes used to
store digital data (excluding analog tapes such as VHS), and
memory chips; and security devices.  Based on my knowledge,
training, and experience, as well as information related to me by
agents and others involved in the forensic examination of digital
devices, I know that data in digital form can be stored on a
variety of digital devices and that during the search of the
premises it is not always possible to search digital devices for
digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte

70

of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

      d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may

also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

       e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

      f.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control

the digital device remotely is not present on the digital device.
Evidence of the absence of particular data on a digital device is
not segregable from the digital device.  Analysis of the digital
device as a whole to demonstrate the absence of particular data
requires specialized tools and a controlled laboratory
environment.

      g.   The United States has not attempted to obtain this
data by other means.

//

//

//

//

//

74

## IX.

### CONCLUSION

68.   Based on the foregoing, I believe there is probable
cause to believe that AJIT, NISHA, and RUNJHUN violated Title 18,
United States Code, Section 371: Conspiracy to Commit Visa Fraud
in violation of Title 18, United States Code, Section 1546(a).

69.   Based on the foregoing, there is probable cause to
believe that the fruits, instrumentalities, and evidence of
violations of Title 18, United States Code, Section 371:
Conspiracy to Commit Visa Fraud in violation of Title 18, United
States Code, Section 1546(a), will be found at SUBJECT PREMISES 1
and SUBJECT PREMISES 2 identified in paragraph 7 and Attachment
A.

_____
Christopher Klinghoffer
Special Agent
United States Immigration and
Customs Enforcement


SUBSCRIBED TO AND SWORN BEFORE ME
THIS _29th_ DAY OF MARCH 2011

### MARC L. GOLDMAN

_____
UNITED STATES MAGISTRATE JUDGE